May it please the court, Katherine Tassinari representing Christina Slayter, plaintiff at the moment. The MJ failed in two particular ways in handling this case. The first was he did not acknowledge the 2009 psychologist's finding that the claimant had a working memory at two percentile. He also failed to acknowledge that the psychologist had observed that Ms. Slayter was unable to remember more than one simple instruction at a time. This is important for several reasons. One is the vocational expert, when asked about this limitation, said that this would probably require sheltered employment. The other reason it's important is that it supports the testimony of Tony Clock, the friend of the claimant who met her when she was a teacher's aide, when Ms. Clock was a teacher's aide in the claimant's special education group. The 2009 report from Dr. Jaffe says that Ms. Slayter was able to understand and remember simple instructions during the interview. She was, yes.  I think that's a broad statement, but she clarified it later by saying she could remember only one simple instruction at a time. And truly, if we didn't have the V.E. testimony on this, we might wonder, but we have not only that, but other things. Well, that's why I'm wondering, is the 2010, or 2011, I'm sorry, finding that you think the ALJ should have paid more attention to, or the 2009 one? Well, I think he should have paid more attention to both of them. He overtly, explicitly rejected Dr. Roman, who wrote both of these. It's a confusing thing, but he explicitly rejected her opinion in 2011. Why would he reject the 2011? That's what I was going to ask first. It seems to me that he rejected the 2011 opinion because he gave more credit to the 2009 opinion. He did, and he did apparently. He didn't reject the 2011 opinion. He actually rejected it because he gave more weight to 2009. That's right. He did. He gave more weight to 2009. He rejected it, and that seems perfectly logical since the 2011 is just a checkbox exercise. There's no written comments. There's no observations. There's no testing. That seems perfectly rational, doesn't it? No. I don't think so. That's not rational to take a report that's that brief, to explain things in detail over something that was just checkboxes. Well, they were written by the same person. Dr. Roman wrote the 2009, and also then she examined her, and I think it's the Garrison case that I cited, but it's not just the checkbox that we look at, but also the records that support the doctor's findings. Did she change her condition between 2009 and 2011? I don't believe so. And isn't it right here that she was disabled from birth? Well, it's true that she was in Special Olympics all her life. She was in the Special Olympics. She went to the Intellectual Disabilities Association, the ARC. She has a modified diploma. She has a lifelong intellectual disability. She also has work history. She has three children, and she has work history. Yes, Your Honor. She has a marginal work history. There's extensive testimony as to her limitations on the job. And we also have, I think, very compelling evidence from a woman who was her teacher's aide in her special education class who has known her her whole life. She pointed out and told us. Tell me what the ALJ's error was, in your view, with respect to the clock test. The only part of her testimony that he mentioned was that Ms. Clock testified or wrote somewhere, I think, maybe testified, that she had coached Ms. Slater in the Special Olympics and that she had a lot of determination. And he pulled that out, and he put that in his. But he didn't talk about all the other things she said. Tell me what the applicable standard is as to that. What should? You should have accepted the testimony or rejected it. Procedurally, what do you think the ALJ should have done with respect to the clock test? He has to address it. He has to give a germane reason for rejecting it. But he just didn't mention that part. He just didn't mention it. And that made it possible for him to say some of the things that were already mentioned. She worked. She worked. She had three children, and she lived independently for a couple of years. Really what you're saying in this case is that you have a problem, not so much with what the ALJ said, but what he didn't say, in the sense that he didn't look at or comment on, he may have looked at, but he didn't comment on those facts, whether it's the clock testimony or the expert's opinions that maybe kind of availed the conclusion he was reaching. That's right, Your Honor. Yes. He has a duty to explain away contradictory facts that are corroborative or important to this case. One of the things that the ALJ thought was very important was that she had lived independently for a few years while raising her children. And in my reply brief, I address this. And I went through. She's 43 years old, and it looks like at the most she lived independently for about three years. And she lived with her parents for about 16 years prior to the hearing. So the evidence shows that she has lived independently very briefly, and according to Ms. Clock, not successfully. Well, but I want to get back to Judge Smart's point. This is a record from which, if the judge had appropriately commented on things, he might have found an extra client. Do you agree? It's not a record in which we have to credit through everything here. Well, Your Honor, when you look at the vocational testimony. The vocational testimony was if she could do simple tasks, assuming they operated under special supervision. Your problem is that there was contrary testimony that wasn't. Correct. Correct. Okay. So given what the judge said the facts were, then he was correct in saying I was not. Well, Your Honor, this court on many occasions has credited testimony where limitations that were not credited by the ALJ were then discussed by the V.E. Right. The V.E. in this case says with the limitations that are discussed, she can do work in the national economy. I think you're arguing, I think it's quite disparaging to us. I don't know if disparaging it is that. Well, we don't, if the ALJ had more carefully treated the testimony and actually had a different finding, then given what the V.E. said, we would have a conclusion that she couldn't work in the national economy. Is that a fair statement? I would say that if he properly credited Ms. Clough and the psychologist, he would have to award benefits. Okay. Okay. Thank you. Good morning, Your Honor. Joseph Blankhammer on behalf of the commissioner. I'd like to start by addressing Ms. Slater's argument about Dr. Rowan's opinion, the 2009 and the 2011 opinions. Ms. Slater is arguing that the ALJ did not express, I think today she argued the one instruction at a time sentence that Dr. Rowan included in the 2009 opinion. She also mentioned today something about, first of all, working memory, which I don't recall seeing in the brief. But, anyhow, I'll address both points. You see, also, I think I would add a third point to that, that Ms. Clough's testimony was not appropriately credited or commended. Correct. So I'll address all three points. First, the ALJ did, in fact, reject any notion, to the extent that Dr. Rowan's 2005 opinion can be read as suggesting something less than simple, routine instructions. The ALJ did reject that. I think you're right. So here's my concern. The ALJ looks at the 2011 report, as Judge Weber indicates, as a check-the-box report. And it's heavy, the ALJ's report, as well. I really think the report from the other doctor in 2009, Ashley Samender, deserves much more credit than the 2011 report. It appears to me from this record that the ALJ did not realize that the very doctor who had examined this applicant in 2009, and, therefore, he couldn't reject the report simply by saying, well, there's some examining person that's just a good check-the-box. Now, he doesn't say that expressly, but that's sure what I get from reading this record. Tell me if that's true, why we shouldn't go back to the ALJ and say, hey, we realize this is the same person, the same person who supported your silver lining from 2009, and two years later says something that's contrary to it. She's the examining psychologist. Tell us why you would reject her later in the interview. The reason is because the ALJ, regardless of whether or not the ALJ knew that Dr. Jaffe and Dr. Romo were the same person, regardless of that fact, the ALJ provided specific legitimate reasons for it. The reason, so I want you to read this, the reason he presented, I think, for rejecting the 2011 check-the-box was it was inconsistent with the report of the other doctor in 2009. Now, it was the same doctor in 2009. So, given that, why is the question the same? So there were, in addition to the point that your honor raised about inconsistency, and because in 2011 there's really one crucial difference that Dr. Romo made in 2011, and I'll get to your honor's point in a moment, but there's really one crucial difference. In 2011, Dr. Romo said this person would not be able to work without special supervision. That doesn't appear in the 2009 report. So, what the ALJ said in looking at both of those opinions, regardless of whether or not the ALJ knew that they were the same person, was, number one, as your honor pointed out, 2009 was more thorough than 2011. But there were other reasons for rejecting that, quite two specific legitimate reasons. They were inconsistent with her academic level, including the fact that she was able to engage in work for years, and they were inconsistent with her ability to raise children on her own for a period of time. That may be true. Did the ALJ provide those reasons for rejecting the 2011 report, which came, we now know from an examining physician, not simply a reviewing physician? Yes, your honor, the ALJ did provide those reasons. I would refer the court to page 19 of the record, and I'll read from it this morning. It states, Dr. is referring to the 2011 opinion. Dr., it's second paragraph, about halfway down. While the objective findings clearly show that the claimant has intellectual limitations, there is no support for finding that she is incapable of succeeding in simple tasks. The ALJ goes on. Dr. Roman's finding, and this is with respect to the case, I see it, and that's why I call it what you're reading. The paragraph begins with this language. The undersigned skips great, he's talking about Dr. Roman's report. Correct. The undersigned skips great a way to Dr. Jaffe's assistant, because it appears to be more thorough in her findings were more consistent with the fact, et cetera, et cetera. It is clear to me that what the ALJ is doing here is crediting one doctor's opinion over another. He's entitled to do so, but when it's the same doctor and he doesn't know that, that's what troubles me. And I think if we look at it, so that is one reason, but really there are three reasons that the ALJ provided here for discounting, again, regardless of whether or not it's the same doctor, for discounting that 2011 opinion about special supervision. And in addition to, number one, crediting the 2009 opinion more because it's more thorough, the ALJ goes on to say that the 2011 special supervision limitation does not account for her work history, so that's number two, and does not account for her independence in daily life. That's number three. So my point is that even if the ALJ, and in our briefing, you know, the commissioner recognizes that. No, you're quite candid here. So to the extent that there is, to the extent that the ALJ was unaware of this, it makes no difference under this court's precedent, because all that's required is specific and legitimate reasons for discounting. Let me ask you a question slightly differently. If one of the specific and legitimate reasons, and I think it's a fair reading in this paragraph, is she was examined thoroughly by Dr. Jaffe two years before, and this Dr. Roman hasn't done his thorough examination, then it's wrong. I wouldn't say that it's necessarily wrong, because what we look at is if the ALJ was aware that this was the same doctor, once it's confirmed that this was the same doctor, and the ALJ was aware of that, it seems to me that Dr. Roman did not include, after this thorough examination, didn't include any limitation that said, this person requires special supervision. Two years later, all of a sudden, we have a new checkbox report, which later Dr. Roman said, well, I based that on my 2009 evaluation. But we have a new limitation, and one that the vocational expert said, well, this looked more like just the work environment. So the question becomes, well, I mean, there's an inconsistency there, regardless of whether or not the ALJ knew that this was the same doctor. And the ALJ's reasoning still holds, because in 2009, simultaneously with conducting that thorough examination, the ALJ could be Dr. Roman did not include any limitation on this citer's ability to perform work absent special supervision. Well, let me type it for a moment. I understand and I agree that ALJs are not required to recite in the same way, even to all the opinions contained within a single doctor's report. Here we have one doctor, we believe, with two reports, and therefore I treat it as a whole. And I disagree all of a sudden that he made a change. Two years in between reports, and there's additional record evidence about that two-year period. So are you telling me that it doesn't make any difference whether it's one doctor or two doctors in this case? In this case, the fact that the ALJ addressed the first opinion as Dr. Jaffe and the second opinion as Dr. Roman, because that's what the signature said, my argument is that, no, it doesn't make a difference. The ALJ, despite the supervision difference, it doesn't affect the outcome of this case because, again, the ALJ provided three specific and legitimate reasons. And if the court finds that one of those reasons is unconvincing, it would be harmless under this court's precedent. And I would also add that we're not just looking at Dr. Roman's reports here. We have two other doctors, two other psychologists, who looked at this record. That's Dr. Anderson and Dr. Kelmer. And both of them looked at the records and found that this person's not examining, just reviewing the records. Correct? Correct. And you're talking about clock and statistics. Yes, that's the question I was going to choose after clock. Oh, that's it. Ms. Klopman. Yes, Ms. Klopman. You say that the error was harmless because their testimony was duplicative, but it was not truly coincidental. It wasn't. There were differences. It did not mirror Ms. Slater's testimony. But it's very close. It provided additional information that was not included in Slater's testimony, more detailed evidence regarding Slater's need for supervision, and so forth. She did provide some differences, but they're not meaningful. Would you agree it would have been helpful for the AOJ to comment more about Klopman's testimony? It would have been helpful, yes. But at the end of the day, the standard for articulation isn't necessarily what would have been more helpful for the AOJ to say more. I think the standard is can we, and this is the court's only decision, I believe, saying from Supreme Court precedent, that says as long as the AOJ's reasoning and path can reasonably be discerned, the court should affirm. And what we have here is we have, and I see my time is just about up, but if I could finish this one point. We do have the AOJ at page 18 of the transcript saying, with respect to the claimant's function and the limitations in this part of the claimant's allegations. And then he went on to say at 19 that discounting third-party witnesses, discounting third-party witnesses to the extent that they were inconsistent with the evidence, and therefore, under the Molina decision from the 8th Circuit, the reasons for rejecting the limitation about special supervision or the allegations the plaintiff has made in this case, which were very similar to what this clock testified to, are sufficient for rejecting this clock's testimony as well. Okay. I have one last question. So has the claimant been rejected before for Social Security? Yes. Okay. And since the claim is that she's been disabled from birth, is there no collateral assault along that? The player, I believe, what you're referring to is I believe there was a 1986 application and a 1992 application, which were denied. Under the agency's rules and under this court's precedent, there would be a race truncata effect to those decisions, and there would be continuing presumption of disability. Now, that weighs heavily.  I'm sorry. Of non-disability. Non-disability. So that would be, that weighs very heavily in favor of DLJ's decision in this case, which is that finding her not disabled. If she hasn't come forth with any evidence, damage to her identity, if she's overcome that presumption. So, but to your Honor's point, it's still appropriate to consider what she's actually saying in this case. She's saying that she's had these long-standing outcomes, a long-standing disability that's prevented her from working since birth, and, in fact, she has worked since birth. So, Am I mistaken in how I'm going to handle this race truncata argument We did make the point in our brief, Your Honor. We didn't technically call it race truncata, but we raised it. I can't remember. You have something about the history, but do you say one reason to reject this is because this is a heavy presumption against disability? The DLJ didn't rely on that as a race truncata argument. The DLJ did not, Your Honor. We made the point in our brief as I can recall. Is something we rely on? It's not an independent basis here, because the DLJ didn't actually make a finding, but the commissioner has cited the Chavez case in the brief to underscore the point that. I'm just not sure. I mean, you can probably correct this as a matter of law. I'm just not sure it's appropriate for us in this case, but I wanted to make sure whether you'd argue that it is an independent ground for sustaining the decision. And I think it weighs, I think anything about me underscores the DLJ's decision. Thank you very much. Thank you very much. Ms. Slater, you have reserved some time. Your Honor, there's not one bit of evidence as to what Ms. Slater's condition was prior to 2009. There is not any evidence in the record other than the ALJ's assertion that she ever did apply. There's no application. There's no denial. There is no evidence whatsoever on that point. I'm disappointed that my briefing in both my opening and reply briefs on working memory were not noticed. That was one of my biggest complaints about the ALJ. He does not even mention that she has an extremely low working memory. Nor does he acknowledge the one simple instruction at a time, and then the subsequent VE testimony. In terms of Ms. Clock, the importance of Ms. Clock is that the claimant is what Dr. Roman called a concrete thinker. And the reason it was so important for plaintiff's counsel to have Ms. Clock is that she was able to articulate really what the claimant's problem is. So her testimony is very important. It goes to her ability to live on her own, her ability to work, her ability to function without continuous support. Thank you. Thank you very much. I thank both counsel for the argument. Senator versus the United States. The next case on the calendar is Stringer versus USDA.
judges: Bybee, Hurwitz, Zouhary